United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 09, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-30251** |
| **MARTHA ANDERSON BURG,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| _____ | § | |
| **MICHAEL O'CONNOR,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 19-3372** |
| | § | |
| **MARTHA ANDERSON BURG,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Attorney Michael O'Connor removed a state court proceeding to this Court seeking determination under 11 U.S.C. §523(a)(2)(A) as to the nondischargeability of $170,591.02 in fees earned under a contingent fee agreement for pre-petition representation of Martha Anderson Burg. Mr. O'Connor passed away before the conclusion of this adversary and Sandra G. O'Connor, Independent Executor of the Estate of Michael C. O'Connor, was substituted as plaintiff. The Court conducted a full day trial on March 22, 2022, and, at the conclusion of the trial, the court took the matter under advisement. For the forgoing reasons, the Court finds that Ms. Burg's $170,591.02 debt to Sandra G. O'Connor, Independent Executor of the Estate of Mr. O'Connor, is nondischargeable. Additionally, Sandra G. O'Connor, Independent Executor of the Estate of Michael O'Connor is awarded $56,617.75 in attorney's fees and $518.48 in expenses.

### I.   BACKGROUND

1. On March 30, 2007, Martha Burg ("*Burg or Defendant*") entered into a home equity loan (the "*Home Equity Loan*") in the original principal sum of $270,000.00.[1]

2. On September 9, 2008, Burg defaulted on the Home Equity Loan that was secured by her residence located at 5330 Dumfries Drive, Houston, Texas 77096 (the "*Property*").[2]

3. Burg never made any payments on the Home Equity Loan after June 1, 2008, save and except one payment in 2009.[3]

4. On September 9, 2008, Burg was sued by her mortgage company Saxon Mortgage Services, Inc. for an expedited foreclosure of Burg's home equity loan under Cause No. 2008-54797 styled *In re Order for Foreclosure Concerning Martha A. Burg and 5330 Dumfries Drive, Houston, Texas 77096* (the "*2008 Lawsuit*").[4]

5. On October 31, 2008, Burg filed a pro se answer in the 2008 Lawsuit.[5]

6. On October 19, 2009, the 2008 Lawsuit was dismissed.[6]

7. On June 19, 2009, Saxon Mortgage Services, Inc. filed a second application for an expedited foreclosure of Burg's home equity loan under Cause No. 2009-39239; styled *In re Order for Foreclosure Concerning Martha A. Burg and 5330 Dumfries Drive, Houston, Texas 77096* (the "*2009 Lawsuit*").[7]

8. On February 10, 2010, the 2009 Lawsuit was dismissed.[8]

9. On August 3, 2010, Saxon Mortgage Services, Inc. filed its third application for an expedited foreclosure of Burg's home equity loan under Cause No. 2010-47883; styled *In re Order for Foreclosure Concerning Martha A. Burg and 5330 Dumfries Drive, Houston, Texas 77096* (the "*2010 Lawsuit*").[9]

10. On September 20, 2010, Burg hired Michael O'Connor, ("*Mr. O'Connor*") to represent her in the 2010 Lawsuit, and Mr. O'Connor filed an answer on Burg's behalf.[10]

11. On December 13, 2012, Mr. O'Connor successfully stopped Saxon Mortgage Services, Inc.'s efforts to foreclose under the 2010 Lawsuit, and the 2010 Lawsuit was administratively closed.[11]

---

[1] ECF No. 72 at 2, ¶ 1.
[2] ECF Nos. 72 at 2, ¶ 2; 69-1; 69-5; 69-8; 69-21; 69-28.
[3] ECF Nos. 72 at 2, ¶ 3; 69-24.
[4] ECF No. 72 at 2, ¶ 4; 69-1.
[5] ECF Nos. 72 at 2, ¶ 5; 69-2.
[6] ECF Nos. 72 at 2, ¶ 6; 69-3.
[7] ECF Nos. 72 at 2, ¶ 7; 69-5.
[8] ECF Nos. 72 at 2, ¶ 8; 69-6.
[9] ECF Nos. 72 at 2, ¶ 9; 69-8.
[10] ECF No. 72 at 3, ¶ 10; 69-10.
[11] ECF No. 72 at 3, ¶ 11; 69-11.

12. On May 18, 2011, Mr. O'Connor, upon request of Burg, filed a lawsuit against Saxon Mortgage Services, Inc. under Cause No. 2011-30025; styled *Martha Burg vs Saxon Mortgage Services, Inc.* (the "*2011 Lawsuit*") pursuant to Rule 736-10 seeking to declare that Burg's Mortgage was unenforceable, among other claims.[12]

13. On July 31, 2012, the 2011 Lawsuit was nonsuited without prejudice.[13]

14. During the pendency of the 2011 Lawsuit, no actions to foreclose on the Property were initiated by Burg's mortgage lender.[14]

15. On May 10, 2013, Residential Credit Solutions, successor in interest to Saxon Mortgage Services, Inc., filed an Application For Home Equity Foreclosure Order and Affidavit under Cause No. 2013-28135; styled *In re Order for Foreclosure Concerning Martha A. Burg and 5330 Dumfries Drive, Houston, Texas 77096* (the "*2013 Foreclosure Lawsuit*").[15]

16. In May 2013, Burg told Mr. O'Connor that she could not afford $1,000.00 or more per month to cover the legal fees incurring the 2013 Foreclosure Lawsuit.[16]

17. Burg and Mr. O'Connor discussed a contingent fee arrangement, the relevant terms of which were that Mr. O'Connor would be entitled to 30% of any recovery, including any reduction of indebtedness on the mortgage loan, before any appeal of a final judgment and 35% if there was an appeal of a final judgment.[17]

18. Mr. O'Connor and Burg signed a contingent fee agreement (the "*Fee Agreement*"), providing that Mr. O'Connor would be entitled to 30% of any recovery, including any reduction of indebtedness on the mortgage loan, before any appeal of a final judgment and 35% after an appeal of a final judgment.[18]

19. On July 1, 2013, Mr. O'Connor filed a response on behalf of Burg in the 2013 Lawsuit.[19]

20. On August 16, 2013, Mr. O'Connor moved to dismiss the 2013 Foreclosure Lawsuit.[20]

21. On September 10, 2013, the Court dismissed the 2013 Foreclosure Lawsuit.[21]

22. On August 12, 2013, Mr. O'Connor, on Burg's behalf, filed a lawsuit against Residential Credit Solutions Inc. under Cause No. 2013-47157; styled *Martha Burg vs Residential Credit Solutions, Inc.* (the "*Second 2013 Lawsuit*").[22]

---

[12] ECF Nos. 72 at 3, ¶ 12; 69-13.
[13] ECF Nos. 72 at 3, ¶ 13; 69-14.
[14] ECF No. 72 at 3, ¶ 14.
[15] ECF Nos. 72 at 3, ¶ 15; 69-21.
[16] ECF Nos. 72 at 3, ¶ 16; 69-44.
[17] ECF Nos. 72 at 3, ¶ 17; 69-22; 69-40;69-41; 69-44.
[18] ECF Nos. 72 at 4, ¶ 18; 69-40.
[19] ECF Nos. 72 at 4, ¶ 19; 69-23.
[20] ECF Nos. 72 at 4, ¶ 20; 69-24.
[21] ECF Nos. 72 at 4, ¶ 21; 69-25.
[22] ECF Nos. 72 at 4, ¶ 22; 69-27.

23. The Second 2013 Lawsuit sought to hold the Deed of Trust lien and power of sale therein sought to be foreclosed by Burg void and barred by limitations.[23]

24. On September 14, 2014, after litigating a highly contested Motion for Summary Judgment, Mr. O'Connor was successful in obtaining a final judgment (the "*Final Judgment*") in the Second 2013 Lawsuit.[24]

25. The Final Judgment held that the liens sought to be foreclosed by Residential Credit Solutions were void pursuant to Tex. Civ. & Prac. Rem Code §16.035(d).[25]

26. Residential Credit Solutions appealed the Final Judgment under Cause No. 01-15- 0067-CV; styled *Residential Credit Solutions, Inc., Appellant v Martha Burg, Appellee.*[26]

27. On June 2, 2016, the First Court of Appeals affirmed the Final Judgment and entered its Mandate on August 12, 2016.[27]

28. The result of the Second 2013, Lawsuit was the cancellation of Burg's entire indebtedness on the mortgage loan.[28]

29. Under the Fee Agreement, Mr. O'Connor was entitled to a 35% of the reduction of indebtedness on the mortgage loan.[29]

30. In 2010, Mr. O'Connor, on behalf of Burg, filed suit against Texas EZ Pawn, L.P. d/b/a EZPawn in the 295th Judicial District Court of Harris County, Texas (the "*EZPawn Litigation*") arising from Burg's pawn, sales, layaway, and other transactions with EZPawn.[30]

31. On October 2, 2012, the EZPawn Litigation was settled, the terms of which required Burg to pay $35,000 in exchange for the return of all items Burg pawned with EZPawn.[31]

32. Mr. O'Connor loaned Burg $35,000 to fund the settlement of the EZPawn Litigation and received certain collateral to secure the loan.[32]

33. Mr. O'Connor was never repaid the $35,000 loan, however, eventually accepted the collateral in satisfaction of the loan.[33]

---

[23] ECF Nos. 72 at 4, ¶ 23; 69-27.
[24] ECF Nos. 72 at 4, ¶ 24; 69-28; 69-29; 69-30; 69-31.
[25] ECF Nos. 72 at 4, ¶ 25; 69-31.
[26] ECF Nos. 72 at 4, ¶ 26; 69-36.
[27] ECF Nos. 72 at 5, ¶ 27; 69-35.
[28] ECF No. 72 at 5, ¶ 28.
[29] ECF Nos. 72 at 5, ¶ 29; 69-22.
[30] ECF No. 72 at 5, ¶ 30.
[31] ECF No. 72 at 5, ¶ 31.
[32] ECF Nos. 72 at 5, ¶ 32; 69-16; 69-17; 69-18.
[33] ECF No. at 5, ¶ 33.

34. On July 3, 2017, Burg took out a reverse mortgage on her home but did not pay Mr. O'Connor's fees.[34]

35. Mr. O'Connor fully performed under the Fee Agreement by eliminating Burg's debt on the mortgage note and deed of trust.[35]

36. Mr. O'Connor did not misrepresent anything to Burg concerning the Fee Agreement or his representation of Burg.[36]

37. On January 18, 2019, Burg filed her initial petition under chapter 7 of title 11 of the Code.[37]

38. On April 1, 2019, Cause No. 201707392; *Michael C. O'Connor v. Martha Burg*; in the 151st District Court of Harris County, Texas (the "*State Court Lawsuit*") as removed to the United States Bankruptcy Court for the Southern District of Texas, Houston Division commencing the instant adversary proceeding.[38]

39. On May 7, 2019, Mr. O'Connor filed a first amended complaint.[39]

40. On May 17, 2019, Burg filed a motion to dismiss along with an answer and counterclaims.[40]

41. On May 21, 2019, the Court entered its scheduling order.[41]

42. On May 8, 2020, Mr. O'Connor filed a response to the motion to dismiss.[42]

43. On May 12, 2020, the Court held a hearing on the motion to dismiss and denied it but ordered Mr. O'Connor to amend his complaint.[43]

44. On May 26, 2020, Mr. O'Connor filed his second amended complaint ("*Complaint*").

45. On June 9, 2020, Burg filed an answer to the Complaint and withdrew her counterclaims ("*Answer*").[44]

---

[34] ECF Nos. 72 at 5, ¶ 34; 69-37; 69-38; 69-39; 69-40.
[35] ECF Nos. 72 at 5, ¶ 35; 69-31; 69-35.
[36] ECF No. 72 at 5, ¶ 30.
[37] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.§) thereof refers to the corresponding section in 11 U.S.C. "Bankr. ECF" refers docket entries made in the Debtors' bankruptcy case, No. 19-30251.  The Court will cite to the record in Adversary Proceeding, No. 19-3372, unless otherwise noted.
[38] ECF No. 1
[39] ECF No. 6.
[40] ECF No. 11.
[41] ECF No. 14.
[42] ECF No. 26.
[43] ECF No. 29.
[44] ECF No. 33.

46. On September 21, 2021, Burg filed a "Suggestion of Death" reflecting that Mr. O'Connor had passed away on September 13, 2021.[45]

47. On October 5, 2021, the Court held another status conference regarding the "Suggestion of Death" and set a further hearing for November 3, 2021. [46]

48. On November 3, 2021, a "Motion To Substitute Party" was filed by Sandra G. O'Connor ("*Mrs. O'Connor*" or "*Plaintiff*"), Independent Executor of the Estate of Michael C. O'Connor, requesting that she be substituted as plaintiff for Michael C. O'Connor.[47]

49. On November 17, 2021, the Court entered an order approving Mrs. O'Connor, to be substituted as plaintiff.[48]

50. On March 22, 2022, a trial on the pending matter was held.[49]

## II.    CREDIBILITY OF WITNESSES

It is the Court's duty to assess and weigh the credibility of witnesses.[50]  At the March 22, 2022 trial, the Court heard testimony from four witnesses: (1) Mrs. O'Connor; (2) Burg; (3) Mina Uddin; and (4) Mynde Eisen.  After observing the witness and listening to their testimony, the Court makes the following observations regarding the credibility of the witnesses, as set forth below.

### 1.  Mrs. O'Connor

Mrs. O'Connor is the wife of Mr. O'Connor and the Independent Executor of the Estate of Michael C. O'Connor.[51]  At the trial, Mrs. O'Connor responded to questions clearly, completely, and directly.[52]  Thus, the Court finds that she very credible witness and gives substantial weight to her testimony.

---

[45] ECF No. 50.
[46] ECF No. 51.
[47] ECF No. 57.
[48] ECF No. 60.
[49] ECF No. 77.
[50] *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc. (In re Complaint of Port Arthur Towing Co.)*, 42 F.3d 312, 318 (5th Cir. 1995)).
[51] ECF No. 60.
[52] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses in order to make credibility determinations).

**2. Burg**

Burg is the Defendant in this adversary and the Debtor in the underlying bankruptcy case.[53] The Court finds that Burg's credibility is highly questionable because of her inconsistent responses, evasive answers, and selective memory when answering certain questions. At various points during her testimony, Burg was unable to recall basic details such as when she was divorced,[54] what decade her husband died in,[55] or what year her son was born.[56] Furthermore, her testimony frequently departed from her past depositions or signed admissions. In a request for admissions from Mr. O'Connor, answered by Burg on October 17, 2019, Burg admitted that she took out the Home Equity Loan on or about March 30, 2007.[57] However, at the trial, when asked whether she took out a loan on March 30, 2007, Burg repeatedly testified that she did not remember.[58] Additionally, despite previously denying that she agreed to sell her home in order to satisfy the Fee Agreement,[59] Burg contradicted herself by admitting that she interpreted the Fee Agreement to mean that once the final decision came in for the Second 2013 Lawsuit, that that would be the point in which she would need to sell her home to satisfy the obligation to Mr. O'Connor.[60] These examples reflect just a few of the many occurrences in which Burg's testimony was not credible. Therefore, the Court gives very little weight to Burg's testimony.

**3. Mina Uddin**

Mina Uddin worked as a legal assistant and paralegal for Mr. O'Connor from 2008 to 2020.[61] The Court finds that Mina Uddin was a very credible witness and gives substantial weight

---

[53] *See* ECF No. 1 and Bankr. ECF No. 1.
[54] ECF No. 77 at 10:34:20-10:36:40; 10:43:40-10:47:30.
[55] *Id.* at 10:30:25-10:34:20.
[56] *Id.* at 10:33:50-10:34:20.
[57] ECF No. 69-44.
[58] ECF No. 77 at 10:27:25-10:28:20.
[59] ECF No. 33 at 2, ¶ 11.
[60] ECF No. 77 at 2:42:00-2:42:58.
[61] *Id.* at 1:30:10-1:31:35.

to her testimony.

### 4. Mynde Eisen

Mynde Eisen is co-counsel for Plaintiff in this adversary and had known Mr. O'Connor professionally for about thirty-five years.[62]  This included working for Mr. O'Connor and then later as a friend.[63]  The Court finds that Mynde Eisen was a very credible witness and gives substantial weight to her testimony.

### III.   CONCLUSIONS OF LAW

## A.  Jurisdiction and venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11."  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[64]  This court determines that pursuant to 28 U.S.C. § 157(b)(2)(I), this Adversary Proceeding contains core matters, as it primarily involves proceedings to determine dischargeability of a particular debt.[65]  This suit is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.[66]  Preventing the discharge of a specific debt—here, the amount owed under the Fee Agreement for which Burg is liable can only occur in a bankruptcy court. There is no state law equivalent for this action.

---

[62] *Id.* at 2:47:40-2:50:00.

[63] *Id.*

[64] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[65] *See* 11 U.S.C. § 157(b)(2)(I).

[66] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

This Court may only hear a case in which venue is proper.[67]  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  The Debtor's main chapter 7 case is presently pending in this Court; therefore, venue of this adversary proceeding is proper.

## B.  Constitutional authority to enter a final judgment

This Court has an independent duty to evaluate whether it has the constitutional authority to sign a final order.[68]  In *Stern,* which involved a core proceeding brought by the debtor under 28 § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[69]  As indicated above, the pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).  The ruling in *Stern* was only limited to the one specific type of core proceeding involved in that dispute, which is not implicated here.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final judgment here.[70]  Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2),[71] this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final judgment in the dispute at bar.  In *Stern,* the debtor filed a counterclaim based *solely* on state law; whereas, here, the claim

---

[67] 28 U.S.C. § 1408.

[68] *Stern v. Marshall*, 564 U.S. 462 (2011).  *But see Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938-39 (2015) (holding that parties may consent to jurisdiction on non-core matters).

[69] 564 U.S. at 503, 131 S.Ct. 2594.

[70] *See, e.g., Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547-48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' .... We decline to extend *Stern's* limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503, 131 S.Ct. 2594).

[71] *See First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.),* 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern's* 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2)....").

brought by Plaintiff is based *primarily* on an express provision of the Bankruptcy Code—§ 523(a)(2)—and judicially-created bankruptcy law interpreting this provision.[72] This Court is therefore constitutionally authorized to enter a final judgment on the complaint.

Finally, in the alternative, this Court has the constitutional authority to enter a final judgment on Plaintiff's complaint because Mr. O'Connor and Burg have consented, explicitly, to adjudication of this dispute by this Court.[73] On May 17, 2019, Burg consented to the entry of final orders and judgments by this Court.[74] On June 29, 2020, Mr. O'Connor entered his notice of consent to the entry of final orders and judgments by this Court.[75] As such, this Court has the constitutional power to enter a final judgment in this proceeding.

## C. Defendant's nondischargeability claim

There are two distinct issues to consider in the dischargeability analysis: (1) the establishment of the debt itself, under relevant state or non-bankruptcy federal law; and (2) a determination as to the nature of the debt—i.e. whether it is dischargeable or nondischargeable.[76] As set forth below, the Plaintiff has met his burden of proving each of these two elements.

### 1. Establishment of the Debt

---

[72] The Court notes that there is some Texas law involved in the claims that O'Connor has brought under § 523(a)(2)(A). That is why this Court finds that the claim brought by O'Connor is based primarily, as opposed to solely, on federal law.

[73] *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 686 (2015).

[74] ECF No. 11.

[75] ECF No. 37.

[76] *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331 (10th Cir. 1994) (noting that there are two distinct issues in a nondischargeability proceeding); *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 782 (Bankr. S.D. Tex. 2008) ("The underlying cause creating the pre-petition debt must not be confused with the characterization of debts excepted from discharge."); *Estate of Smith v. Smith (In re Smith)*, 495 B.R. 291, 297 (Bankr. N.D. Miss. 2013) (holding that a claim must first be established under relevant state or non-bankruptcy law and only then does the federal nondischargeability issue come into play); *King v. Skolness (In re King)*, 624 B.R. 259, 287 (Bankr. N.D. Ga. 2020) ("The first step is to determine whether a debt exists. If the debtor owes a debt to the plaintiff, the second step is to determine the nature of the debt—i.e. whether it is dischargeable or nondischargeable.").

A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt.[77]  The Bankruptcy Code defines the term "debt" to mean "liability on a claim"[78] and "claim" is defined as a "right to payment, whether or not such right is reduced to judgment . . . ."[79]

On Burg's Schedule E/F, she checked the box indicating that her unsecured debt to Mr. O'Connor was disputed.[80]  However, in the Joint Pre-Trial Order,[81] Burg stipulated to numerous facts which amount to a concession of liability to Mr. O'Connor.  Specifically, Burg stipulated that: (1) Mr. O'Connor and Burg signed the Fee Agreement;[82] (2) the Fee Agreement provided that Mr. O'Connor would be entitled to 30% of any recovery, including any reduction of indebtedness on the mortgage loan, before any appeal of a final judgment and 35% after an appeal of a final judgment;[83] (3) in 2014, Mr. O'Connor successfully obtained the Final Judgment in the Second 2013 Lawsuit resulting in the cancellation of the entire outstanding debt on Burg's mortgage;[84] (4) in 2016, the First Court of Appeals entered a Mandate on the Final Judgment;[85] (5) Mr. O'Connor was thus entitled to 35% of the reduction of the indebtedness on the mortgage under the Fee Agreement;[86] (6) Mr. O'Connor fully performed under the Fee Agreement; and (7) Mr. O'Connor did not misrepresent anything to Burg concerning the Fee Agreement.[87]

---

[77] *Jefferson Bank v. Hollins (In re Hollins)*, No. 19-02951-NPO, 2020 Bankr. LEXIS 3387, at *8 (Bankr. S.D. Miss. 2020).
[78] 11 U.S.C. § 101(12).
[79] 11 U.S.C. § 101(5).
[80] Bankr. ECF No. 18.
[81] ECF No. 72.
[82] Id. at 4, ¶ 18.
[83] *Id.*
[84] *Id.* at 4, ¶ 24.
[85] *Id.* at 5, ¶ 27.
[86] *Id.* at 5, ¶ 35.
[87] *Id.* at 5, ¶ 36.

Notwithstanding Burg's concession, Plaintiff has established Burg's liability on O'Connor's right to payment by a preponderance of the evidence.  This included offering a copy of the Fee Agreement signed by both Martha Burg and Michael O'Connor and stating that Mr. O'Connor would be entitled to 30% of any recovery, including any reduction of indebtedness on the mortgage loan, before any appeal of a final judgment and 35% after an appeal of a final judgment.[88]  Additionally, Plaintiff submitted the 2014 opinion awarding the Final Judgment in the Second 2013 Lawsuit[89] and the 2016 opinion from the First Court of Appeals entering a Mandate on the Final Judgment.[90]

Regarding the amount of the debt owed under the Fee Agreement, Mynde Eisen testified that in order to calculate the amount owed to Mr. O'Connor, she first looked at the 2013 Foreclosure Lawsuit.[91]  This stated that the amount owed as of April 23, 2013 was $420,455.55.[92]  She also determined that the principal balance on the loan was $266,102.40.[93]  Ms. Eisen explained that she next looked to a Stipulation Agreement signed by Burg which listed the variable interest rate with a floor or 7.6% and a ceiling of 10.3%.[94]  Since she could not be certain whether the interest rate fluctuated during this time, Ms. Eisen used the 7.6% floor in her calculation.[95]  Applying to the principal balance of $266,102.40, this resulted in $66,947.36 in interest between April 23, 2013 and August 12, 2016.[96]  This was added to the $420,455.55 amount owed for a total of $487,402.91.[97]  As stated above, it is undisputed that under the Fee Agreement, Mr. O'Connor was

---

[88] ECF No. 69-22.
[89] ECF No. 69-31.
[90] ECF No. 69-35.
[91] ECF No. 77 at 2:51:10-2:52:20; ECF No. 69-21.
[92] ECF No. 69-21 at 2, ¶ 7.
[93] ECF No. 77 at 2:53:10-2:53:50; ECF No. 69-30 at 45.
[94] ECF No. 77 at 2:53:00-2:54:00.
[95] ECF No. 77 at 2:53:00-2:54:00.
[96] ECF No. 77 at 2:54:00-2:55:00.
[97] *Id.*

entitled to a 35% of the reduction of indebtedness on the mortgage loan.[98]  Applying the 35% fee to this total, Ms. Eisen calculated that Mr. O'Connor was entitled to $170,591.02.[99]

Burg offers only one defense as to liability to Mr. O'Connor under the Fee Agreement.  In her Answer, Burg asserts that an alleged oral promise to sell her home made in connection with the Fee Agreement is subject to the statute of frauds under Texas law.[100]  Tex. Bus. & Com. Code § 26.01 provides that certain types of contracts are not enforceable unless it is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.[101]  Of the eight possible options, the Court finds that the only relevant subsection is § 26.01(4) – a contract for the sale of real estate.[102]

At trial, Plaintiff offered evidence that in 2013 Burg made an oral promise to Mr. O'Connor that she would sell her home in order to satisfy her debt under the Fee Agreement if Mr. O'Connor was successful in removing the mortgage indebtedness.[103]  To Burg, the failure to include the alleged promise to sell her home in a signed writing as part of the Fee Agreement violated the statute of frauds.[104]  Thus, Burg contends that she is not liable for the debt under the Fee Agreement.

---

[98] ECF Nos. 72 at 5, ¶ 29; 69-22.
[99] *Id.*
[100] ECF No. 33 at 4, ¶ 23.
[101] Tex. Bus. & Com. Code § 26.01.
[102] Subsection 1 is not applicable because these facts do not involve a promise by an executor or administrator. Subsection 2 is also immaterial since there is no promise regarding the debt, default, or miscarriage of another person. Further, the alleged promise was not in consideration of marriage; for the lease of real estate for a term longer than one year; an agreement which is not be performed within one year of making the agreement; an agreement to pay the commission for the purchase of oil or gas mining lease, oil or gas royalty, minerals, or a mineral interest; or an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 74.001, Civil Practice and Remedies Code. Thus, § 26.01(3), (5)-(8) are inapplicable. Tex. Bus. & Com. Code § 26.01.
[103] Mynde Eisen testified that Mr. O'Connor told her that Burg promised to sell her home if Mr. O'Connor won the Second 2013 Lawsuit. ECF No. 77 at 2:48:30-2:50-23. Further, although little weight is given to her testimony, Burg contradicted herself on the record by admitting that she interpreted the Fee Agreement to mean that once the final decision came in for the Second 2013 Lawsuit, that that would be the point in which she would need to sell her home to satisfy the obligation to Mr. O'Connor. ECF No. 77 at 2:42:00-2:42:58.
[104] ECF No. 33 at 4, ¶ 23.

This argument misapplies the requirements to establish a debt with determination of the nature of the debt.  In this specific case, it is immaterial to this establishment of the debt analysis whether the statute of frauds bars enforcement of Burg's alleged promise to sell her home. Whether the promise to sell her home is included in the Fee Agreement or not, the remainder of the Fee Agreement clearly and unambiguously provides for the recovery of 35% of the reduction of the indebtedness on the mortgage.[105]  Even Burg admits as much.[106]  Just because this additional oral term may or may not be added into a contract, does not render the remainder of the contract void.

Accordingly, Burg's statute of frauds argument is without merit, and Plaintiff has established that Burg incurred a $170, 591.02 debt to Plaintiff under the Fee Agreement.

### 2.  Nondischargeability under 11 U.S.C. §523(a)(2)(A)

Next, turning to the nature of debt, Plaintiff argues that Burg's $170,591.02 debt is nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A).[107]  Section 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[108]  The United States Supreme Court has distinguished between "false pretenses and representations" and "actual fraud," and recognized two distinct paths for nondischargeability under § 523(a)(2)(A).[109]

---

[105] ECF No.69-22.
[106] ECF No. 72 at 5, ¶ 35.
[107] ECF No. 32.
[108] *See* 11 U.S.C. § 523(a)(2)(A).
[109] *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

Here, Plaintiff asserts only the false pretenses and representations theory.[110]  For a debtor's representation to be a false representation or false pretense, it must have been: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party.[111]  A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence.[112]  In an adversary proceeding to determine the dischargeability of a debt under § 523(a), the plaintiff bears the burden of proving the elements by a preponderance of the evidence.[113]

### a. Whether a knowing and fraudulent falsehood was made

The first element of nondischargeability under a false pretenses and representations theory of § 523(a)(2)(A) is demonstrating that defendant made a knowing and fraudulent falsehood.[114] When considering whether a knowing and fraudulent falsehood has been made, the subjective mindset of the promisor is the focus.[115]  "A misrepresentation is fraudulent if the maker . . . knows or believes . . . the matter is not as represented, or does not have the confidence in the accuracy of his representation as stated or implied, or knows . . . he does not have the basis for his representation as stated or implied."[116]  A misrepresentation by a debtor of his or her intention to perform

---

[110] ECF No. 32 at 5, ¶ 21 ("Plaintiff would not have entered into the Contingent Fee Agreement and/or performed legal work which resulted in the cancellation of debts and liens against the Property without Burg's representations and promises to perform under the Contingent Fee Agreement at the time it was made.").

[111] *Zeba, LLC v. Hosseini (In re Hosseini)*, Nos. 18-20177, 19-2001, 2021 Bankr. LEXIS 1319, at *22 (Bankr. S.D. Tex. 2021).

[112] *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287-88 (8th Cir. 1987) (abrogated on other grounds); *Webster City Prod. Credit Ass'n v. Simpson (In re Simpson)*, 29 B.R. 202, 211-12 (Bankr. N.D. Iowa 1983*); Mick v. Hosking (In re Hosking)*, 19 B.R. 891, 895 (Bankr. W.D. Wis. 1982); *Sun Bank and Trust Co. v. Rickey (In re Rickey)*, 8 B.R. 860, 863 (Bankr. M.D. Fla 1981).

[113] *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Tower Credit, Inc. v. Gauthier (In re Gauthier),* 349 F. App'x 943, 945 (5th Cir. 2009); *Allison v. Roberts (In re Allison),* 960 F.2d 481, 483 (5th Cir. 1992); *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995); FED. R. BANKR. P. 4005.

[114] 11 U.S.C. § 523(a)(2)(A).

[115] *Higgins v. Nunnelee (In re Nunnelee)*, 560 B.R. 277, 285 (Bankr. N.D. Miss. 2016).

[116] *Id.* (quoting *AT&T Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 407 (5th Cir. 2001)).

contractual duties, for example, may be a false representation under the Code.[117]  This intent may

be inferred from the fact that the debtor failed to take any steps to perform under the agreement.[118]

Here, Burg had no intention of performing under the Fee Agreement as promised because

Burg intended all along to avoid paying Plaintiff.  First, at trial, evidence was introduced that once

the Mandate on the Final Judgment was entered in August 2016, and it became time for Burg to

perform, Burg became unresponsive to Mr. O'Connor's numerous attempts to arrange for pay-

ment.[119]  This occurred for several months over a variety of forums including phone calls, texts,

emails, and Mr. O'Connor even personally visiting Burg's home.[120]  After these efforts proved

futile,[121] Mr. O'Connor eventually filed a lawsuit against Burg for recovery of the contingent fee

on February 2, 2017.[122]

Next, Plaintiff provided evidence showing that Burg attempted to drain the equity from her

primary asset,[123] her home, shortly after the Mandate was entered in order to avoid paying her

obligation.  On December 23, 2016, just a few months after the Mandate on the Final Judgment

was entered, Burg closed on a reverse mortgage on her home.[124]  Despite owing a significant debt

to Mr. O'Connor at this time, Burg did not inform Mr. O'Connor of her decision to take a reverse

---

[117] *Nat'l Diversity Council v. Carter (In re Carter)*, Nos. 17-35082, 17-03446, 2018 Bankr. LEXIS 3636, at *62 (Bankr. S.D. Tex. 2018).

[118] *Id.*; *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 199 (Tex. App.—Houston [1st Dist.] 2014) ("The speaker's intent at the time of the representation may be inferred from the speaker's acts after the representation was made."); *Gillon v. Saini (In re Saini)*, Nos. 12-57801 CN, 14-4151, 2015 Bankr. LEXIS 302, at *17 (Bankr. N.D. Cal. 2015) ("Intent to deceive may be inferred when a party fails to make initial, or preliminary steps to perform a contractual obligation."); *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989) ("[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A).").

[119] *Id.* at 9:36:00-9:38:00.

[120] *Id.*

[121] ECF No. 69-41 at 55, 2-21.

[122] ECF No. 7.

[123] It is undisputed that before entering into the Fee Agreement in 2013, Mr. O'Connor had represented Burg for three years and was aware that Burg could no longer afford his legal fees. *see* ECF No. 72 at 3, ¶¶ 10, 16. Furthermore, in a 2019 deposition, Burg testified that she was not working in 2013 when she entered into the Fee Agreement and that she had a social security income of approximately $3000 per month. ECF No. 69-41 at 44-45.

[124] ECF Nos. 69-37; 69-38.

mortgage.[125]  Furthermore, the funds obtained from the reverse mortgage were not used to pay Mr.

O'Connor but rather to make improvements on Burg's home, fix up her car, and to pay her bills.[126]

As stated above, intent as to a debtor's mindset when making a representation may be in-

ferred from the fact that the debtor later failed to take any steps to perform under the agreement.[127]

In this case, Burg's obligation to perform under the Fee Agreement arose when the Mandate was

entered in 2016.  The evidence shows that not only did Burg fail to take any steps to perform under

the Fee Agreement but that she took steps to ensure that she would never have to.  It is also im-

portant to highlight that Burg does not argue that she ever intended to honor the Fee Agreement[128]

and concedes that Mr. O'Connor did not misrepresent anything to Burg concerning the Fee Agree-

ment or his representation of Burg.[129]

Accordingly, the Court finds that Burg made a knowing and fraudulent falsehood that she

would perform under the Fee Agreement.

### b.  Whether the knowing and fraudulent falsehood described past or current facts

Under § 523(a)(2)(A), the Fifth Circuit has held that a false representation must "encom-

pass statements that falsely purport to depict current or past facts."[130] The Fifth Circuit has also

noted that misrepresentations concerning a past or current fact of the debtor's future intention will

satisfy this element.[131]

---

[125] ECF No. 69-41 at 55, 20-25.

[126] ECF No. 69-41 at 56, 1-9.

[127] *In re Carter*, Nos. 17-35082, 17-03446, 2018 Bankr. LEXIS 3636, at *62.

[128] "[I]f, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation." *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997).

[129] ECF No. 72 at 5, ¶ 30.

[130] *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991).

[131] *In re Allison*, 960 F.2d at 484 ("A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised.").

In *Jacobson*, the borrower represented to the lender that he would use any loan proceeds advanced by the lender for a specific purpose.[132]  Subsequently, the borrower immediately spent the loan proceeds to pay "existing debts or other obligations [unrelated to the specific purpose], which left no remaining funds" for that specific purpose.[133]  There, the court held that the borrower's representations described past or current facts, and not future facts; and therefore, the debt was held to be nondischargeable  under § 523(a)(2)(A).[134]

Like the borrower in *Jacobson*, Burg made a representation to Mr. O'Connor about her intent to pay her obligation under the Fee Arrangement if Mr. O'Connor successfully represented her in the 2013 Foreclosure Suit.  After prevailing in that suit, not only did Burg fail to make payments to Mr. O'Connor but she immediately cut off communication with Mr. O'Connor[135] and took out a reverse mortgage on her home.[136]  Thus, the Court finds that Burg's representation that she would pay her obligation under the Fee Arrangement if she won the 2013 Foreclosure Suit was a false statement about current facts.

Accordingly, the Court finds that Burg made a knowing and fraudulent falsehood describing current or past facts.

### c.  Whether Mr. O'Connor relied upon the knowing and fraudulent falsehood

The third and final element of nondischargeability under a false pretenses and representations theory of § 523(a)(2)(A) is that Mr. O'Connor relied on the false representation.[137]

---

[132] *Jacobson v. Ormsby (In re Jacobson)*, No. 04-51572-RBK, 2006 U.S. Dist. LEXIS 70433, 2006 WL 2796672, at *10 (W.D. Tex. Sept. 26, 2006).
[133] *Id.*
[134] *Id.*
[135] ECF No. 77 at 9:36:00-9:38:00.
[136] ECF No. 72 at 5, ¶ 34.
[137] 11 U.S.C. § 523(a)(2)(A).

The parties agree that before entering into the Fee Agreement in 2013, Mr. O'Connor had represented Burg for three years and was aware that Burg could no longer afford his legal fees.[138] Further, the Fee Agreement clearly reflects that Mr. O'Connor and Burg entered into a contingent fee arrangement, and that the work was not done on a pro bono basis.[139]  The fact that Mr. O'Connor entered into a contingent fee arrangement rather continue to represent Burg pro bono supports the notion that he was relying on Burg's promise that she would satisfy her obligation under the Fee Agreement.  This is additionally supported by the testimony of Mrs. O'Connor who stated that her and her husband were facing difficult financial times during the period in which Mr. O'Connor executed the Fee Agreement with Burg.[140]  Hence, Mr. O'Connor would have been less likely to enter into a contingent fee arrangement in which he knew Burg never intended to perform.

Accordingly, the Court finds that Mr. O'Connor relied on Burg's knowing and fraudulent falsehood that she would perform under the Fee Agreement.

### 3.  Attorney's fees

Plaintiff has also made a request for $56,617.75 in attorney's fees and $518.48 in expenses.[141]  Under, Tex. Civ. Prac. & Rem. Code § 38.001(1), a person may recover reasonable attorney's fees from an individual in addition to the amount of a valid claim and costs, if the claim is for services rendered.[142]  To recover the requested fees, Plaintiff bore the burden of establishing the reasonableness and necessity of the fees.[143]

Testimony was presented by Mynde Eisen that she was retained by Mrs. O'Connor after the passing of Mr. O'Connor in September 2021.[144]  Ms. Eisen stated that the services she provided

---

[138] ECF No. 72 at 3, ¶¶ 10, 16.
[139] ECF No. 69-22.
[140] ECF No. 77 at 9:28:10-9:30:15.
[141] *Id.* at 2:56:30-3:01:00.
[142] Tex. Civ. Prac. & Rem. Code § 38.001(1).
[143] *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 489 (Tex. 2019).
[144] ECF No. 77 at 2:56:30-2:57:00.

included: reviewing and reconstructing Mr. O'Connor's case file, preparing and filing joint trial brief, and preparing for trial.[145]  She further stated that she hired attorney Gary Cerasulo to help her with the litigation.[146]  Up to and including trial, Ms. Eisen stated that she had worked 120.85 hours on this case,[147] and that the total fees incurred by her, Mr. Cerasulo, and work done by her paralegals was $36,617.75.[148]

Ms. Eisen further testified that, up until his death, Mr. O'Connor had represented himself pro se in the State Collection Suit.[149]  Mr. O'Connor continued to represent himself in the bankruptcy litigation once the case was removed.[150]  Mr. O'Connor's work on the case included taking Burg's deposition, filing for removal, conducting discovery, and defending against a motion to dismiss.[151]  She stated that Mr. O'Connor's fee was normally $485 per hour but Ms. Eisen was seeking only $400 per hour.[152]  She estimated, based on her personal experience as an attorney, and experience working with Mr. O'Connor that he had spent fifty hours working on the case before he passed away.[153]  This results in a total of $20,000.00 in attorney's fees for Plaintiff.

Finally, Ms. Eisen is also seeking recovery of expenses paid both by she and Mr. O'Connor. Ms. Eisen testified that she had incurred $168.48 in filing fees and Mr. O'Connor had incurred $350.[154]

The Court finds that the request for $36,617.75 in attorney's fees from Ms. Eisen's work and $20,000 for attorney's fees from Mr. O'Connor's work are both fair and reasonable.  Burg

---

[145] *Id.* at 2:57:20-2:58:00.
[146] *Id.* at 2:56:40-2:56:50.
[147] *Id.* at 3:00:10-3:00:40.
[148] *Id.* at 2:59-30-3:00:30.
[149] *Id.* at 2:58:00-2:59:00.
[150] *Id.* at 2:58:40-2:59:00.
[151] *Id.* at 2:58:50-2:59:20.
[152] *Id.* at 2:59:45-3:00:00.
[153] *Id.* at 2:59:35-2:59:50.
[154] *Id.* at 3:00:20-3:00:38.

failed to controvert or offer evidence undermining either of these fee requests.  Similarly, Burg

failed to controvert that the fees were not necessary.   Therefore, Plaintiff will be awarded

$56,617.75 in attorney's fees for the work of Ms. Eisen and Mr. O'Connor.  The Court also finds

that Plaintiff's request for $168.48 in filing fees paid by Ms. Eisen and $350 in filing fees paid by

Mr. O'Connor is fair and reasonable.  Plaintiff will be awarded $518.48 in expenses.

Accordingly, Plaintiff is awarded $56,617.75 in attorney's fees and $518.48 in expenses.

### 4.  Post-Judgment Interest on the Total Amount of Attorney's Fees and Expenses

Additionally, the Court will also order the Burg to pay post-judgment interest on the total

amount of attorneys' fees and costs awarded to the Plaintiff.  The Fifth Circuit has held that interest

on attorney's fees begins to accrue on the date of the judgment allowing recovery of attorneys' fees

and runs until the date the fees are paid in full.[155]  Further, if the prevailing party is awarded attor-

neys' fees and those fees are a part of the judgment, then those fees will bear interest at the same

rate as that applied to the judgment on the merits.[156]  The Fifth Circuit allows this interest on

attorney's fees because it "better serve[s] the purpose of awarding these expenses to the prevailing

party since it . . . more nearly compensate[s] the victor for the expenses of the litigation."[157]  The

post-judgment interest that accrues on the attorney's fees and costs is also a nondischargeable

obligation. In making this conclusion, the Court relies upon the language in *Cohen* that the non-

dischargeable debt imposed upon the Debtor includes "other relief."[158]  In the suit at bar, the rate

---

[155] *See Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542, 544-45 (5th Cir. 1983) (en banc), overruled in part on other grounds by *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir. 1986), aff'd 482 U.S. 437, 107 S. Ct. 2494, 96 L. Ed. 2d 385 (1987).

[156] *Id.*

[157] *Id.* at 544.

[158] *Cohen v. De La Cruz*, 523 U.S. 213, 223 (1998); *see also In re Ayesh*, 465 B.R. at 449-50 (finding legal fees to be nondischargeable); *Wegmans Food Mkts., Inc. v. Lutgen (In re Lutgen)*, No. 98-CV-0764E(SC), 1999 U.S. Dist. LEXIS 5160, 1999 WL 222605, at *3 (W.D.N.Y. Apr. 5, 1999) (same).

that will be in effect on the date of the entry of the judgment will be 2.14% per annum.[159]

## IV.   CONCLUSION

A Judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED June 9, 2022

_____
Eduardo Rodriguez
United States Bankruptcy Judge

---

[159] Post-Judgment Interest Rates, United States District & Bankruptcy Court Southern District of Texas, http://www.txs.uscourts.gov/page/post-judgment-interest-rates (last visited June 7, 2022).